---

DANIEL D. BROWN,

        Plaintiff,

        v.                        Case No. 25-CV-156

NATHAN T. PASCHKE,

        Defendant.

---

## DECISION AND ORDER

---

Plaintiff Daniel Brown is an inmate at Fox Lake Correctional Institution and representing himself in this 42 U.S.C. § 1983 action. He is proceeding on an Eighth Amendment deliberate indifference claim as well as a state law medical malpractice claim against Defendant Physical Therapist Nathan Paschke based on allegations that PT Paschke provided ineffective treatment for Brown's neck and shoulder pain in 2024. This matter comes before the Court on PT Paschke's motion for summary judgment. Dkt. No. 19. For the following reasons, the Court grants PT Paschke's motion for summary judgment and dismisses the case.

## BACKGROUND

At the relevant time, Brown was incarcerated at Fox Lake Correctional Institution, where PT Paschke worked as a physical therapist. As a physical therapist, PT Paschke provides physical therapy services to patients for both acute and chronic conditions, under the general supervision of the Health Services Nursing Coordinator and the daily direction of the Health Services Manager. Such services include performing physical therapy assessments of patients using appropriate tests/measures and designing and implementing treatment programs, including in-clinic treatment

and home exercises.  PT Paschke also monitors patients and adjusts their treatment programs as appropriate based on treatment goals and objectives and communication with other healthcare staff.  Dkt. No. 21, ¶¶ 1–3.

On November 21, 2023, Dr. Shirley Godiwalla saw Brown for right shoulder pain and cervical spine pain.  Dr. Godiwalla placed an order for Brown to be evaluated for physical therapy stating, "He needs exercise[s] to strengthen his neck, posture, and both shoulders."  *Id.* ¶¶ 7, 9.

PT Paschke saw Brown on January 4, 2024, for an initial physical therapy evaluation. Before the initial evaluation, PT Paschke reviewed Dr. Godiwalla's November 21, 2023, notes and saw no concerns, from a medical perspective, with Brown participating in physical therapy. PT Paschke also reviewed Brown's radiographic summaries for his cervical spine and both shoulders taken on November 24, 2023.  The X-rays showed degenerative disc disease, bone spurring, and calcification of the cervical spine.  Based on frequently seeing asymptomatic populations with similar findings, PT Paschke did not believe Brown's X-rays were of immediate concern.  *Id.* ¶¶ 11–13.

During the January 4, 2024, visit, Brown complained of having "long-standing" neck and shoulder pain.  He stated that it was difficult for him to find a comfortable position in his bed that did not put stress on his neck or shoulders and that when he turned his head, his neck felt tight. Brown reported his neck pain as a five on a scale of one to ten and his right and left shoulder pain as a three.  He advised that he was going to have a CT scan of his cervical spine in the near future. On assessment, PT Paschke noted that Brown had a history of bicep tendon ruptures with no surgical intervention.  Although PT Paschke had previously treated Brown for this in 2019 with subjective reports of improvement, it is not uncommon to have some chronic pain and weakness associated with the condition.  Brown otherwise presented with significant postural deficits and

2

cervical/thoracic mobility limitations, which were consistent with his subjective pain. *Id.* ¶¶ 14, 16.

PT Paschke performed Spurling's test, which involves passively moving the patient's neck into lateral flexion and extension, then applying gentle downward axial compression, without aggravation of any of Brown's symptoms. PT Paschke did not observe any change during a cervical distraction and thus did not note any significant concerns for nerve or spinal cord compression. Brown sat and stood with significant thoracic kyphosis, a condition characterized by excessive forward curvature of the thoracic spine that creates a forward head posture. Brown was also extremely weak through the multifidi and middle to lower trapezius for postural extension of the thoracic spine. When Brown laid on his back with his face upward, he was unable to rest his head on a pillow due to the thoracic kyphosis and forward head. Brown also had difficulty lying on his side due to the bicep tendon rupture. PT Paschke performed therapeutic exercises designed to correct impairment, restore muscular and skeletal function, and maintain overall well-being. *Id.* ¶¶ 16–20.

After concluding the evaluation, PT Paschke believed that Brown would benefit from skilled physical therapy to address the postural deficits PT Paschke identified with the goal of improving Brown's nervous system's ability to regulate and coordinate his movement when looking in all directions; to extend his ability to sit, stand, lift, and carry; and to improve his overall physical activities. PT Paschke's treatment plan called for Brown to attend physical therapy once a week for a total of six weeks. This is the standard plan of care for therapy in Corrections. The treatment would include manual therapy; neuromuscular re-education/posture body mechanics training to improve coordination, balance posture, and muscle activation; pain management; therapeutic activities; therapeutic exercise; and thermal/light modalities to promote healing and

3

relieve pain. PT Paschke planned to offer Brown a home exercise program, which included towel "sustained natural apophyseal glides" (SNAGs), cervical retraction and rotation, seated thoracic extensions, a "half superman" exercise, and postural awareness. Towel SNAGs are designed to restore pain-free movement and function by gliding the joint surfaces while the patient performs an active movement. PT Paschke also issued Brown an extra pillow as a short-term restriction (to end March 4, 2024) while he was in physical therapy. He hoped the pillow would allow for improved therapeutic rest and recovery at night which, in turn, would allow for better compliance with postural strength and endurance exercises. *Id.* ¶¶ 21–25.

On January 16, 2024, PT Paschke saw Brown for his second physical therapy visit. Brown reported feeling "queasy" with his home exercise program but indicated that it did feel better to sit straight compared to a week prior. During this session, cervical retraction, thoracic extension, scapular retraction, and myofascial roller/soft tissue mobilization were performed. Brown reported mild nausea throughout the session but had no signs or symptoms of vertigo. His blood pressure was taken and was 127/86. There was no definite reason for his reported symptoms other than that they were possibly related to a virus. PT Paschke monitored Brown during the visit and determined that if Brown's symptoms remained the following week, PT Paschke would notify nursing or a provider. PT Paschke told Brown to continue to slowly work into extension and back strengthening as tolerated and that he may split up his home exercise program so as not to overexert himself and decrease the chances of nausea. PT Paschke believed that Brown would continue to benefit from skilled physical therapy to further address posture and scapular stabilization. He reviewed and discussed the home exercise program with Brown and encouraged Brown to resume the towel SNAG stretch during his home exercise program as tolerated. *Id.* ¶ 31. Although PT Paschke states that the towel SNAG was not performed in session, Brown asserts that it was

4

and that it caused him severe pain to the point where he screamed "stop."  *Id.*; Dkt. No. 25, ¶ 31; Dkt. No. 27, ¶ 1.

On January 25, 2024, PT Paschke saw Brown for his third physical therapy visit.  Brown reported that he was continuing to experience nausea when performing the home exercise program. He stated that he was doing the home exercise program and spacing the exercises out due to the nausea.  Brown did not report any nausea during this session like he had the week before.  Because Brown did not express anxiety over the nausea and merely wondered what was causing it, PT Paschke did not think Brown's nausea was an issue that needed evaluation by nursing or a provider.  PT Paschke was aware that Brown had an upcoming CT scan which could offer more insight.  Brown stated that he would split his exercises up more that week to determine what specifically caused the nausea.  Dkt. No. 21, ¶ 35.

During the visit, PT Paschke worked with Brown on stretches for mobility and posture.  He also used a myofascial roller on Brown's upper trapezius muscle by applying mild to moderate pressure to mobilize Brown's soft tissue.  *Id.* ¶ 37.  Brown asserts that PT Paschke's use of the roller on his neck with pressure caused him extreme pain.  Dkt. No. 25, ¶ 36.  PT Paschke noted that Brown's thoracic and cervical posture was much improved compared to a few weeks prior but that Brown was still lifting his shoulders up and forward with excessive upper trap tension.  He reminded Brown to be mindful of his posture because any improvement he may make would be lost with the continued upper trapezius shrugging.  PT Paschke believed Brown would continue to benefit from skilled physical therapy for additional control of his posture.  He reviewed and discussed the home exercise program with Brown.  Dkt. No. 21, ¶¶ 36–37.

On February 1, 2024, PT Paschke saw Brown for his fourth physical therapy visit. PT Paschke worked with Brown on stretches for mobility and posture.  Brown reported that he

5

was fine doing the cervical and thoracic extensions during the home exercise program but the superman exercise provoked nausea and dizziness. He stated that his neck felt "stiff." PT Paschke reeducated Brown in the towel SNAGs to address the stiffness he reported. Brown self-administered the SNAGs while standing and reported dizziness for about two minutes. When the dizziness subsided, Brown did the SNAGs in a sitting position and reported visual changes that subsided after two minutes. PT Paschke instructed Brown to avoid doing the SNAGs and the superman exercise until the results of his upcoming CT scan were available. In the meantime, PT Paschke told Brown to continue his cervical and thoracic extensions/postural exercises and focus more on rotator cuff strengthening. PT Paschke believed that Brown would continue to benefit from skilled physical therapy to assist in postural mobilization and shoulder strengthening to increase his tolerance to turning his head, lifting, and physical activities. *Id.* ¶¶ 38–40.

On February 8, 2024, PT Paschke saw Brown for his fifth physical therapy visit. Brown reported having his CT scan the day before and that, in the past week, he experienced a lot of dizziness and felt like he would lose his balance or pass out while performing the home exercise program for his neck. He stated that he felt like his arms were getting a workout just from his job duties of cleaning the visiting area. PT Paschke reviewed the results of Brown's February 7, 2024, CT scan, which showed degenerative disc disease and stenosis. He did not believe the results suggested any reason for Brown's nausea and dizziness. PT Paschke instructed Brown not to perform the home exercise program for his neck at that point but told him to continue his established shoulder exercises. *Id.* ¶¶ 41–42.

That same day, PT Paschke discussed with Dr. Godiwalla Brown's reported nausea and dizziness, since there was nothing from the CT scan or a physical therapy perspective for Brown

to have those symptoms. Dr. Godiwalla told PT Paschke that she would review Brown's chart and look at additional referrals if warranted. *Id.* ¶¶ 43–44.

On February 15, 2024, PT Paschke saw Brown for his sixth and last physical therapy visit in the session. Brown reported that his neck remained stiff and sore and appeared to be more of an issue than his shoulders. He stated that he stopped the home exercise program but still had nausea and dizziness, specifically in doing his job duties. Brown indicated that he would be seeing dental soon for significant dental issues and wondered if that was what made him ill. PT Paschke told Brown to follow dental instructions and, if his dental treatment improves his dizziness, he should resume his home exercise program independently. At discharge, Brown had shown improved postural awareness but continued to report symptoms of neck pain and dizziness. His neck pain was less controlled because he had not been able to consistently perform the home exercise program due to dizziness. PT Paschke noted from Brown's medical records that Brown had an order for an offsite consultation with a neurosurgeon. He advised Brown to follow up with nursing and his primary care provider moving forward, since his therapy sessions had concluded. *Id.* ¶¶ 46–49.

After Brown concluded his physical therapy sessions, he saw Dr. Godiwalla on March 5, 2024. Dr. Godiwalla placed an order for a Toradol injection and a no work restriction for two weeks. She also ordered Brown to wear a soft collar at all times. *Id.* ¶¶ 50–51.

On August 13, 2024, six months after Brown's final physical therapy session, Dr. Robert Mann at Fond du Lac Neurology saw Brown for complaints of left side tingling and numbness, bilateral hand tingling, and left leg burning along with numbness down his whole left side, which had increased over the past several weeks. The symptoms Brown reported at this time were not the symptoms he reported during his physical therapy sessions. Dr. Mann reviewed Brown's MRI

7

which he reported showed a "cord compression at C4-5 and C5-6 secondary to posterior osteophytes at those levels." Dr. Mann suggested spinal cord decompression surgery and prescription pain medication until he was referred to surgery. On October 2, 2024, Brown underwent a cervical fusion at C4-C5 and C5-C6. *Id.* ¶¶ 52–56.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Brown asserts that PT Paschke violated the Eighth Amendment. "[T]he Eighth Amendment, as the Supreme Court has interpreted it, protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical

care." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotation marks omitted). The Court uses a two-part test to evaluate whether medical care amounts to cruel and unusual punishment. It asks (1) "whether a plaintiff suffered from an objectively serious medical condition" and (2) whether the individual defendant was deliberately indifferent to that condition." *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc)). PT Paschke does not dispute that Brown's shoulder and neck pain qualifies as an objectively serious medical condition. Therefore, the Court will focus its analysis on whether PT Paschke was deliberately indifferent to Brown's pain.

An official is deliberately indifferent if that official was aware that the prisoner faced a substantial risk of serious harm but disregarded the risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997); *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). "Something more than negligence or even malpractice is required." *Pyles*, 771 F.3d at 409. Courts defer to a medical professional's treatment decision unless no minimally competent professional would have chosen the same course of treatment under the circumstances. *Id.* A "[d]isagreement between a prisoner and his doctor or even between two medical professionals about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* "[T]he Eighth Amendment does not entitle prisoners to choose their course of treatment." *Harris v. Molinero*, 803 F. App'x 1, 5 (7th Cir. 2020).

Brown asserts that PT Paschke was deliberately indifferent to his complaints of neck and shoulder pain. He contends that he screamed out in pain when PT Paschke performed towel SNAGs on him and used a myofascial roller with pressure. He argues that PT Paschke should not

9

have performed towel SNAGs or used a roller before obtaining a CT scan to ensure the exercises were safe. PT Paschke disputes that Brown screamed out in pain during any of the physical therapy sessions, but even if he had, the totality of Brown's care shows that PT Paschke was not deliberately indifferent to Brown's shoulder and neck pain. *See Petties*, 836 F.3d 722, 728 (7th Cir. 2016) (courts must "look at the totality of an inmate's medical care when considering whether that care evinces deliberate indifference to serious medical needs"). Brown may disagree with PT Paschke's decision to perform physical therapy exercises before Brown underwent a CT scan, but he presents no evidence to support a conclusion that "no minimally competent professional would have so responded under those circumstances." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (citation omitted); *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").

The record reflects that PT Paschke was responsive to Brown's complaints. PT Paschke created a treatment plan to improve Brown's nervous system's ability to regulate and coordinate his movement when looking in all directions; to extend his ability to sit, stand, lift, and carry; and to improve his overall physical activities. The treatment plan consisted of in-clinic treatment once a week for a total of six weeks and home exercises. When Brown complained of nausea and dizziness while performing the exercises, PT Paschke altered Brown's physical therapy program to treat those symptoms and encouraged Brown to continue the exercises as tolerated. Brown seems to suggest that PT Paschke did not provide appropriate care because he continued to complain of neck pain during therapy sessions. However, Brown's neck pain was less controlled than his shoulder pain because he had not been able to consistently perform the home exercise

program for his neck pain as a result of his dizziness. Brown's dissatisfaction with his treatment because it did not alleviate his pain does not constitute deliberate indifference. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("To say the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd."). On this record, no jury could reasonably conclude that the care Brown received evinces deliberate indifference to his shoulder and neck pain. Accordingly, PT Paschke is entitled to summary judgment. PT Paschke argues that he is entitled to qualified immunity, but because the Court is granting summary judgment in his favor on the merits, it need not address that argument.

Finally, because the Court has resolved Brown's federal claims, it will relinquish jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(3); *Williams Electronics Games, Inc. v. Garrity*, 479 F.3d 904, 905 (7th Cir. 2007) (noting that district courts are expressly authorized "to dismiss a supplemental claim when the federal claims have dropped out of the case"). Brown's state law claims will be dismissed without prejudice so that he may pursue them in state court, if he so chooses.

## CONCLUSION

For these reasons, PT Paschke's motion for summary judgment (Dkt. No. 19) is **GRANTED**. Brown's federal claim is dismissed with prejudice, and his state law claim is dismissed without prejudice. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin on April 15, 2026.

s/ *Byron B. Conway*
BYRON B. CONWAY
United States District Judge

11

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.